**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**DENNIS ZAMARIONI,**

**Plaintiff,**

**v.**

**FORTIS INSURANCE COMPANY,**

**Defendant.**                                                   **No. 04-CV-0858-DRH**

**MEMORANDUM AND ORDER**

**HERNDON, District Judge:**

**I.  Introduction and Background**

Pending before the Court is Fortis Insurance Company's motion for summary judgment (Doc. 23).  Zamarioni opposes the motion (Doc. 44).  Based on the pleadings and the applicable case law, the Court grants Fortis Insurance Company's motion for summary judgment.

On October 21, 2004, Dennis Zamarioni filed this breach of contract suit against Fortis Insurance Company ("Fortis") in the Madison County, Illinois Circuit Court (Doc. 2).  According to the complaint, Zamarioni purchased a health insurance policy from Fortis in February 2003 (Doc. 2, ¶ 3).  The complaint states that in January 2004 while Zamarioni was covered by the insurance policy, Zamarioni became ill, received medical care, was hospitalized, and underwent surgery (Doc. 2, ¶ 4).  Zamarioni's complaint alleges that "by reason of said illness

and the medical care, treatment, hospitalization and surgical operation performed . . ., the Plaintiff became entitled under the terms and conditions of said policy, to receive a sum of money, that being, approximately, Ninety Thousand Dollars ($90,000.00) for payment of said medical care, treatment, hospitalization and surgery required to treat, cure and alleviate his medical condition." (Doc. 2, ¶ 6). The complaint also alleges that "Defendant became liable to Plaintiff for the medical expenses incurred to treat his illness in the sum of Ninety Thousand Dollars ($90,000.00), that the Defendant has made no payment, but though often requested to do so, Defendant has failed and refused and still fails and refuses to pay the balance and remainder, or any part thereof, namely Ninety Thousand Dollars ($90,000.00), to Plaintiff, for the loss and damage sustained by him as a result of said illness with interest therein from the date of said loss." (Doc. 2, ¶ 7). Zamarioni claims that the refusal to pay was vexatious and unreasonable and seeks $90,000.00 in damages as well as attorney's fees, penalties and sanctions (Doc. 2, ¶ 8).

On November 23, 2004, Fortis removed the case to this Court pursuant to **28 U.S.C. § 1441(a)** and **28 U.S.C. § 1332(a)** (Doc.1).  Thereafter, Zamarioni moved to remand the case which the Court denied on January 4, 2005 (Doc. 7).  On December 29, 2005, Fortis filed a motion for summary judgment (Doc. 23). Specifically, Fortis argues that it is entitled to summary judgment as to both Plaintiff's complaint and its counterclaim for rescission because Zamarioni made a material misrepresentation in his application for insurance coverage in that he omitted material information regarding his medical history.  On May 18, 2006,

Zamarioni responded to the motion contending that Fortis applied the wrong standard in evaluating his conduct; that his innocent misrepresentation cannot serve as a basis for rescission; and that materiality of an insurance applicant's misrepresentation is a question of fact for the jury (Doc. 44).  Fortis replies that it is entitled to summary judgment because the information contained in the Zamarioni's medical records concerning his heart condition, which was not reported to Fortis in the enrollment form, materially effected the Defendant's acceptance of the risk in insuring Zamarioni, as well as the hazard to be assumed by Fortis in issuing coverage to Zamarioni.  The Court now turns to address the merits of the motion.

## II.  <u>Facts</u>

Dr. Carlos A. Suec is a board-certified cardiologist who has been practicing in that field of medicine for about 20 years. (Doc. 24; Exhibit 4, p. 9).  Dr. Suec first saw Dennis Zamarioni as a patient in July 1986 and has been his cardiologist ever since that time. (Doc. 24; Exhibit 4, p. 10).  Dr. Suec first saw Zamarioni as a referral from Zamarioni's family physician. (Doc. 24; Exhibit 4, ps. 11 & 12).  At that time, Zamarioni complained of chest pains.  (Doc. 24; Exhibit 4, p. 12).  The stress test performed at that time yielded abnormal results. (Doc. 24; Exhibit 4, p. 12).  Dr. Suec continued to monitor Zamarioni.

On August 11, 1993, Zamarioni saw Dr. Suec and complained of "atypical chest pain and shortness of breath." (Doc. 24; Exhibit 4, p. 15).  Results of laboratory work from around this visit were characterized by Dr. Suec as

"abnormal with cholesterol evaluation." (Doc. 24; Exhibit 4, p. 15). Dr. Suec informed Zamarioni of this, gave him dietary recommendations and told him to lose weight. (Doc. 24; Exhibit 4, ps. 15-16). Further, an EKG performed on that date revealed sinus rhythm and a condition known as right bundle branch block. (Doc. 24; Exhibit 4, p. 21 ). Dr. Suec described this condition as a "minor electrical irregularity of the heart that does not have any implications of morbidity or mortality." (Doc. 24; Exhibit 4, p. 21). Shortly thereafter, Zamarioni saw Dr. Suec on December 1, 1993 and he again complained of shortness of breath. Dr. Suec again recommended weight loss, exercise and medications. (Doc. 24; Exhibit 4, ps. 16 & 17). Next, Zamarioni saw Dr. Suec on June 29, 1994 and he did not have any complaints. (Doc. 24, Exhibit 4; p. 18). Thereafter, he saw Dr. Suec on July 13, 1995 and he complained of "right rib pains lasting for hours or days and occasional nausea, especially after meals." (Doc. 24; Exhibit 4, p. 19). Dr. Suec recommended that he have a gallbladder ultrasound as he may have gallbladder disease. (Doc. 24; Exhibit 4, p. 19).

On January 16, 1996, Zamarioni had another EKG. (Doc. 24; Exhibit 4, ps. 20 & 21). The EKG showed that the right bundle branch block was still present along with a condition described as "sinus rhythm and left access deviation." (Doc. 24; Exhibit 4, ps. 20-21 & 25). Dr. Suec testified that the results of these kinds of tests are usually explained to the patient in general terms but not scientific terms. (Doc. 24; Exhibit 4, p. 22).

Zamarioni then saw Dr. Suec on November 24, 1997 (Doc. 24; Exhibit

4, ps. 27-28).  Again, Zamarioni complained of shortness of breath and chest pain (Doc. 24; Exhibit 4, ps. 27-28).  At that time, another EKG was done.  After reviewing the EKG, Dr. Suec characterized Zamarioni's condition as "chronic conductor abnormalities without implications towards his health," but not of the type that would require "medical intervention or treatment" (Doc. 24; Exhibit 4, ps. 27-28).

Zamarioni returned to see Dr. Suec on February 23, 1999.  (Doc. 24; Exhibit 4, p. 28).  He had a no complaints, but did have an urinary tract infection.  (Doc. 24; Exhibit 4, p. 28).

Zamarioni again saw Dr. Suec on May 3, 2000.  This time he complained about "bilateral high chest pains associated with anxiety or stress" and some shortness of breath.  (Doc. 24; Exhibit 4, p. 29).  Another EKG was done.  This EKG revealed no changes from the prior EKGs.  (Doc. 24; Exhibit 4, p. 29).  Dr. Suec prescribed the medication ZEBETA, a beta blocker, for Zamarioni.  (Doc. 24; Exhibit 4, p. 32).

Zamarioni went to see Dr. Suec on June 29, 2001 (Doc. 24; Exhibit 4, p. 32).  At this time, Zamarioni was doing well.  (Doc. 24; Exhibit 4, p. 32).  Dr. Suec instructed Zamarioni to continue with a low cholesterol diet.  (Doc. 24; Exhibit 4, p. 33).  Zamarioni went to Dr. Suec on March 25, 2002.  (Doc. 24; Exhibit 4, p. 33).  Zamarioni did not have any complaints at this time.

On October 7, 2002, another EKG test was ordered which showed normal sinus rhythm, right bundle branch block along with a possible "inferior

infarction." (Doc. 24; Exhibit 4, p. 35). Dr. Suec described the inferior infarction as a heart attack. (Doc. 24; Exhibit 4, p. 35).

On December 23, 2003, Zamarioni saw Dr. Suec again complaining about chest pain and shortness of breath. (Doc. 24; Exhibit 4, p. 37). Dr. Suec changed Zamarioni's medications; he prescribed Inderal and Diovan and ordered a stress test. (Doc. 24; Exhibit 4. P. 38). The stress test was cancelled because Zamarioni called Dr. Suec and reported recurrent chest pain at rest. (Doc. 24; Exhibit 4, p. 40). Instead a cardiac catheterization was performed on Zamarioni on January 14, 2004 followed by cardiac bypass surgery on January 16, 2004. (Doc. 24; Exhibit 4, p. 41).

On or about March 3, 2003, Zamarioni participated in a telephone application with an underwriter from Fortis for purposes of obtaining individual health insurance coverage with Fortis (Doc. 24, Exhibits 2 & 3; Doc. 29, Exhibit 2). During his telephone application, the underwriter asked Zamarioni a series of health history questions covering the past ten years (Doc. 24, Exhibits 2 & 3; Doc. 29, Exhibit 2). The underwriter asked Zamarioni whether he had an heart or circulatory problems (besides the high blood pressure which he had previously disclosed) and Zamarioni answered no (Doc. 24, Exhibits 2 & 3; Doc. 29, Exhibit 2). The underwriter also asked Zamarioni whether he had any respiratory problems and Zamarioni answered no (Doc. 24, Exhibit 2; Doc. 29 Exhibit 2). Further, the underwriter asked Zamarioni if he had ever undergone an EKG, chest x-ray, blood test or any other diagnostic testing of any kind and again Zamarioni answered no

(Doc. 24, Exhibits 2 & 3; Doc. 29, Exhibit 2).   Zamarioni signed the acceptance of offer and attestation, which stated:

"I represent to the best of my knowledge and belief, that all statements and answers, on this enrollment form are complete and true.  My recorded personal health history, the enrollment form and any amendments shall be the basis for the offer of coverage...."  (Doc. 41; Exhibit 6, p. 1).

Based on the information Zamarioni provided to the underwriter in the telephone application and other information taken from his enrollment form, Fortis issued health insurance coverage to Plaintiff effective February 21, 2003 based upon Zamarioni's representation that his health history disclosures were both accurate and complete (Doc. 24, Exhibit 2; Doc. 29, Exhibit 2).

After Fortis issued health insurance coverage to Zamarioni, it discovered that Zamarioni had a number of medical conditions and had undergone a series of diagnostic testing (specifically a series of EKGs, which he failed to disclose  during the application process, said conditions included a history of previous coronary artery disease, a heart disorder known as right bundle branch block, elevated cholesterol, elevated triglycerides, left ventricular hypertrophy, among other conditions, and had undergone a series of EKGs which had yielded abnormal results (Doc. 24, Exhibit 2; Doc. 29, Exhibit 2).  Fortis concluded that Zamarioni failed to disclose his heart condition on his application, and that this omission was material to Fortis' acceptance of Zamarioni for health insurance coverage.  Fortis decided to

rescind Zamarioni's health insurance coverage.

### III. <u>Standard for Summary Judgment</u>

Summary judgment is proper where the pleadings and affidavits, if any, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." **FED. R. CIV. P. 56©; *Oats v. Discovery Zone*, 116 F.3d 1161, 1165 (7th Cir. 1997)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986))**. The movant bears the burden of establishing the absence of fact issues and entitlement to judgment as a matter of law. ***Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)(citing *Celotex*, 477 U.S. at 323)**. The Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant. ***Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201, 1205 (7th Cir. 1998)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986))**.

In response to a motion for summary judgment, the non-movant may not simply rest upon the allegations in his pleadings. Rather, the non-moving party must show through specific evidence that an issue of fact remains on matters for which he bears the burden of proof at trial. ***Walker v. Shansky*, 28 F.3d 666, 670-71 (7th Cir. 1994), *aff'd*, 51 F.3d 276 (citing *Celotex*, 477 U.S. at 324)**. In reviewing a summary judgment motion, the court does not determine the truth of asserted matters, but rather decides whether there is a genuine factual issue for trial. ***Dykema v. Skoumal*, 261 F.3d 701, 704 (7th Cir. 2001)(citing *Anderson*, 477**

**U.S. at 249)**. No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." ***Anderson*, 477 U.S. at 249-50 (citations omitted)**. **Accord *Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir. 1996), cert. denied, 519 U.S. 1055 (1997); *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir. 1994)**.

### IV.  <u>Analysis</u>[1]

Under Illinois law, a misrepresentation in application for insurance is not by itself grounds for denial of coverage. ***Methodist Medical Center of Illinois v. American Medical Security Inc.*, 38 F.3d 316, 319 (7th Cir. 1994)(citations omitted)**. In determining the effects of a misrepresentation on an insurance coverage application, section 154 of the Illinois Insurance Code provides that:

> "No misrepresentation or false warranty made by the insured or in his behalf in the negotiation for a policy of insurance * * * shall defeat or avoid the policy or prevent its attaching unless such misrepresentation, false warranty or condition shall have been stated in the policy or endorsement or rider attached thereto, or in the written application therefor. No such misrepresentation or false warranty shall defeat or avoid the policy unless it shall have been made with actual intent to deceive or materially affects either the acceptance of the risk or the hazard assumed by the company."

**215 ILCS 5/154**. Thus, the statute establishes a two-prong test to be used in

---

[1]Because neither party raised the choice of law issue, the Court will apply Illinois law. "[t]he operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits. . . . Courts do not worry about conflict of laws unless the parties disagree on which state's law applies." ***Wood v. Mid-Valley, Inc.*, 942 F.2d 425, 426-27 (7th Cir. 1991)**.

situations where insurance policies may be voided:  (1) the statement must be false and (2) the false statement must have been made with an intent to deceive or must materially affect the acceptance of the risk or hazard assumed by the insurer. ***Golden Rule Insurance Co. v. Schwartz***, **786 N.E.2d 1010, 1015 (Ill. 2003) (citing *Campbell v. Prudential Insurance Co. of America*, 155 N.E.2d 9 (Ill. 1958); *Weinstein v. Metropolitan Life Insurance Co.,* 60 N.E.2d 207 (Ill. 1945))**.  Under the statute, therefore, a misrepresentation, even if innocently made, can serve as the basis to void a policy.  ***Id.* (citations omitted)**.  "Before a court may determine if a misrepresentation was made with actual intent to deceive or was material, the court must find that a misrepresentation was made." ***Methodist Medical Center***, **38 F.3d at 319. (citations omitted)**.

          "A misrepresentation in an application for insurance is 'a statement of something as a fact which is untrue and affects the risk undertaken by the insurer.'" ***Id.* at 319-20 (citations omitted)**.  "Incomplete answers or a failure to disclose material information on an application for insurance may constitute a misrepresentation when the omission prevents the insurer from adequately assessing the risks involved."  ***Id.* at 320 (citations omitted)**. Under Illinois law, a misrepresentation is material if "reasonably careful and intelligent persons would regard the facts as stated to substantially increase the chances of the event insured against, so as to cause a rejection of the application." ***Small v. Prudential Life Ins. Co.,* 617 N.E.2d 80, 83 (Ill. App. 1993)**.  Even if the material misrepresentation

is made through mistake or good faith, it will void the contract.  In fact, materiality can be determined from the testimony, or an affidavit, of the insurance company's underwriter or employee.  **Small, 617 N.E.2d at 83**.

Here, there is no doubt that Zamarioni's application form contains misrepresentations regarding his medical history.  However, Zamarioni contends that his misrepresentations were not material (in fact he contends that they were innocent as he was not aware of them) and, thus, an innocent misrepresentation cannot serve as a basis for rescission.  The Court does not agree.  Upon review of the record, the Court finds that Zamarioni failed to make complete disclosure of his medical and health history in his application for health insurance, and that this failure amounted to a material misrepresentation.  Specifically, the Court finds that Zamarioni's negative responses to the questions on his application falsely represented that he had never been diagnosed with or treated for any heart condition.  Zamarioni's failure to disclose his prior diagnoses, tests and treatments were misrepresentations within the meaning of **215 ILCS 5/154**.  Further, reasonably careful and intelligent persons would regard Zamarioni's medical history as a substantial risk to a company issuing a health insurance policy.  Zamarioni's failure to disclose his prior diagnoses and treatments was material because his condition "substantially increased the chances of the event insured against, so as to cause a rejection on the application."  *See Methodist Medical* **Center, 38 F.3d at 321 (citations omitted)**.

## V.  <u>Conclusion</u>

Accordingly, the Court **GRANTS** Fortis' motion for summary judgment (Doc. 23).  The Court **DIRECTS** the Clerk of the Court to enter judgment in favor of Defendant/Counter Claimant, Fortis Insurance Company, and against Plaintiff/Counter Defendant Zamarioni on Zamarioni's complaint and Fortis Insurance Company's counterclaim for rescission.

**IT IS SO ORDERED.**

Signed this 20th day of June, 2006.


/s/              David   RHerndon
**United States District Judge**